UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
MIKHAIL TSVEITEL, LUBOV TSVEITEL,
SOLOMON TSEITEL and RIVA TSVEYTEL,

        Plaintiffs,             <u>MEMORANDUM AND ORDER</u>

    -against-               Civil Action No.
                               05-CV-5721
JOSEPH GEOGHEGAN,

        Defendant.
---------------------------------X

Trager, J.:

    Plaintiffs Mikhail Tsveitel ("Mikhail"), Lubov Tsveitel ("Lubov"), Solomon Tseitel[1] ("Solomon") and Riva Tsveytel[2] ("Riva") brought this action in Supreme Court of the State of New York, Kings County, pursuant to N.Y. Insurance Law § 5104(a). Plaintiffs were involved in a motor vehicle collision with a car operated by the defendant Joseph Geoghegan ("defendant"). The action was removed on December 8, 2005. Defendant now moves for summary judgment against three of the plaintiffs - Mikhail, Lubov and Riva ("plaintiffs") – on the grounds that they did not suffer a "serious injury," as required by N.Y. Insurance Law § 5104(a) and defined by N.Y. Insurance Law § 5102(d). Although the claims of each plaintiff comes as close to the line as possible,

_____

    [1] Because the caption to plaintiffs' complaint spells Solomon's last name as "Tseitel," that spelling is used here.

    [2] Because the caption to plaintiffs' complaint spells Riva's last name as "Tsveytel," that spelling is used here.

countervailing precedent requires that defendant's motions be denied.

## BACKGROUND

Plaintiffs allege that they were injured on Saturday July 17, 2004, when the vehicle they occupied was rear-ended by defendant's car. Mikhail was the driver at the time of the accident. Deposition of Mikhail Tsveitel ("Mikhail Dep.") at 9. The force of the collision caused plaintiffs' automobile to rear-end the vehicle stopped directly in front of theirs. Id. at 13-14. Plaintiffs all claim to have been wearing a seatbelt at the time of the incident. Id. at 17; Deposition of Lubov Tsveitel ("Lubov Dep.") at 6; Deposition of Riva Tsveytel ("Riva Dep.") at 7. Plaintiffs' car, totaled as a result of the accident, was towed from the scene. Mikhail Dep. at 22, 24. Plaintiffs did not seek hospital care immediately following the accident (the "July accident"), instead choosing to return home. Id. at 24-27.

Following the July accident, Mikhail was "confined" to his home for one week. Pls.' Resp. to Def.'s Interogs. at ¶ 6. At his deposition, on the other hand, Mikhail testified that he went to work on the Monday immediately following the accident. Mikhail Dep. at 38. Lubov was "confined" to her home for two days. Id. At her deposition, however, Lubov testified that she did not miss any time from work as a result of the accident.

Lubov Dep. at 21.  Riva was "confined" to her home for one day.

Id.  On July 20, 2004, plaintiffs visited with Dr. Randolph

Rosarian, at Elm Medical, P.C. in Brooklyn, New York.

**A.  Mikhail**

During his initial visit with Dr. Rosarian, Mikhail

complained of headaches and neck and back pain.  Pls.'

Affirmation in Opp'n ("Pls.' Opp'n"), Ex. A at 1.  On performing

range of motion testing, Dr. Rosarian measured a decrease from

the norm in range of motion for Mikhail's cervical and lumbar

spine.  Id. at 1-2.  Dr. Rosarian then prescribed that Mikhail

perform a varied regimen of physical therapy that continued until

he concluded that Mikhail had derived the maximum medical benefit

from the treatment.  Id. at 2-3.  After several weeks of physical

therapy without improvement, Dr. Rosarian prescribed and reviewed

two computed tomography ("CT") scans.  The scans revealed disc

bulges at C5-C6 and L4-L5 and a disc herniation at L5-S1.  Id. at

2.  Dr. Rosarian also reviewed two CT scans that were taken

following a 1998 accident that Mikhail was involved in, and

compared them with the two CT scans taken after the July

accident, finding that Mikhail's disc bulges and herniation were

a direct result of the July accident and not a result of the 1998

accident.  Id. at 2-3.

On October 25, 2007, Mikhail was examined by defendant's

expert orthopedist, Dr. Todd B. Soifer ("Dr. Soifer"), and

defendant's expert neurologist, Dr. Maria A. DeJesus ("Dr. DeJesus"). Both experts concluded that Mikhail did not suffer from any disability. Def.'s Mot. for Summ. J. ("Def.'s Mot."), Ex. F at 6, Ex. E at 7. Another defense expert, Dr. Melissa Sapan Cohn ("Dr. Cohn"), a radiologist, reviewed the CT scans taken of Mikhail's cervical and lumbar spine, finding the minimal disc bulges at C5-C6, L4-L5 and L5-S1 to be unrelated to trauma and that there was no evidence of disc herniation. Def.'s Mot., Ex. G at 3, 5-6.

On June 4, 2008, Dr. Rosarian performed a follow-up examination of Mikhail, noting that Mikhail continued to complain about neck and lower back pain. Pls.' Opp'n, Ex. A at 3. Range of motion testing performed by Dr. Rosarian revealed an improved, but still less than normal, range of motion in Mikhail's cervical and lumbar spine. Id. at 3-4. At his deposition, Mikhail testified that he continues experiencing neck and back pain, for which he occasionally takes over-the-counter medication. Mikhail Dep. at 44-45.

**B. Lubov**

During her initial visit with Dr. Rosarian on July 20, 2004, Lubov complained of headaches and pain in her neck, lower back and left hip. Pls.' Opp'n, Ex. H at 1. On performing range of motion testing, Dr. Rosarian measured a decrease from the norm in range of motion for Lubov's cervical and lumbar spine. Id. at 1-

2.  Dr. Rosarian then prescribed a regimen of physical therapy that continued until he determined that Lubov had derived the maximum medical benefit from the treatment.  Id. at 2-3.  After several weeks of physical therapy without improvement, Dr. Rosarian prescribed and reviewed two magnetic resonance imaging ("MRI") scans of Lubov's cervical and lumbar spine.  Id. at 2. The scans revealed disc bulges at C3-C4, C4-C5 and C5-C6 and a disc herniation at L4-L5.  Id. at 2.

On October 25, 2007, Lubov was examined by defendant's experts, Dr. Soifer and Dr. DeJesus.  Both experts concluded that Lubov did not suffer from any disability.  Def.'s Mot., Ex. J at 6, Ex. K at 6.  Dr. Cohn reviewed the MRIs taken of Lubov's cervical and lumbar spine, finding that the disc bulges at C3-C4, C4-C5, C5-C6 and L4-L5 were unrelated to trauma and that there was no evidence of disc herniation.  Def.'s Mot., Ex. L at 4, 6.

On June 4, 2008, Dr. Rosarian conducted a follow-up examination of Lubov, noting that Lubov continued complaining about pain in her neck, lower back and left hip.  Pls.' Opp'n, Ex. H at 3.  Tests performed by Dr. Rosarian revealed an improved, but below normal, range of motion for Lubov's cervical and lumbar spine.  Id.  Lubov testified at her September 25, 2007 deposition, that she continues experiencing pain in her hip and neck.  Lubov Dep. at 25.

**C.  Riva**

During her initial visit with Dr. Rosarian on July 20, 2004, Riva complained of headaches and neck and right knee pain.  Pls.' Opp'n, Ex. M at 1.  On performing range of motion testing, Dr. Rosarian measured a decrease from the norm in range of motion for Riva's cervical spine.  Id.  Dr. Rosarian then prescribed a regimen of physical therapy that continued until he determined that Riva had derived the maximum medical benefit from the treatment.  Id. at 2.  After several weeks of physical therapy without improvement, Dr. Rosarian prescribed and reviewed an MRI of Riva's cervical spine, which revealed disc bulges at C3-C4, C5-C6 and C6-C7.  Id.

On October 25, 2007, Riva was examined by defendant's experts, Dr. Soifer and Dr. DeJesus.  Both experts concluded that Riva did not suffer from any disability.  Def.'s Mot., Ex. N at 7, Ex. O at 6.  Dr. Cohn reviewed the MRI taken of Riva's cervical and lumbar spine, finding the disc bulges at C3-C4, C5-C6 and C6-C7 to be unrelated to trauma and that there was no evidence of disc herniation.  Def.'s Mot., Ex. P at 4.

On June 4, 2008, Dr. Rosarian conducted a follow-up examination of Riva, noting that Riva continued complaining about pain in her neck and right knee.  Pls.' Opp'n, Ex. M at 2.  Tests performed by Dr. Rosarian revealed an improved, but below normal, range of motion in Riva's cervical spine.  Id. at 3.  Riva

testified at her September 25, 2007 deposition that she continues experiencing neck pain.  Riva Dep. at 13.


## DISCUSSION

### (1)

### Standard for Summary Judgment

Summary judgment is to be granted when "the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The non-moving party's evidence is "to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "Genuine issues of fact are not created by conclusory allegations"  Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993). "Summary judgment is proper when, after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party."  Id. (citing Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)).


### (2)

### New York's No-Fault Insurance Law

Because jurisdiction in this case is based on diversity of

citizenship, New York substantive law governs.  <u>See</u> <u>Shady Grove</u>

<u>Orthopedic Assocs., P.A. v. Allstate Ins. Co.</u>, 549 F.3d 137, 141-

42 (2nd Cir. 2008).  According to New York law, "[w]hether a

claimed injury meets the statutory definition of a 'serious

injury' is a question of law which may properly be decided by the

court on a motion for summary judgment."  <u>Martin v. Schwartz</u>, 308

A.D.2d 318, 319, 766 N.Y.S.2d 13, 15 (1st Dep't 2003) (citing

<u>Licari v. Elliott</u>, 57 N.Y.2d 230, 237, 441 N.E.2d 1088, 1091, 455

N.Y.S.2d 570, 573 (1982)).

In order to sustain a cause of action for personal injuries

arising out of negligence from a motor vehicle accident in New

York State, plaintiffs must first prove they sustained either

basic economic loss or serious injury.  N.Y. Insurance Law

§ 5104(a).  A plaintiff must also establish that the injuries

alleged are causally related to the accident at issue.  <u>See</u>

<u>Pommells v. Perez</u>, 4 N.Y.3d 566, 572, 830 N.E.2d 278, 281, 797

N.Y.S.2d 380, 383 (2005).  Serious injury is defined as a

personal injury that results in any of the following:

> [1] death; [2] dismemberment; [3] significant
> disfigurement; [4] a fracture; [5] loss of a fetus;
> [6] permanent loss of use of a body organ, member,
> function or system; [7] permanent consequential
> limitation of use of a body organ or member;
> [8] significant limitation of use of a body function or
> system; or [9] a medically determined injury or
> impairment of a non-permanent nature which prevents the
> injured person from performing substantially all of the
> material acts which constitute such person's usual and
> customary daily activities for not less than ninety
> days during the one hundred eighty days immediately

following the occurrence of the injury or impairment.
N.Y. Insurance Law § 5102(d).

New York courts require objective proof of a plaintiff's
injury in order to "satisfy the statutory serious injury
threshold [as] subjective complaints alone are not sufficient."
Toure v. Avis Rent A Car Sys., Inc., 98 N.Y.2d 345, 350, 774
N.E.2d 1197, 1199-1200, 746 N.Y.S.2d 865, 868 (2002) (internal
citations omitted).  The New York Court of Appeals has long
recognized that "the legislative intent underlying the No-Fault
Law was to weed out frivolous claims and limit recovery to
significant injuries."  Dufel v. Green, 84 N.Y.2d 795, 798, 647
N.E.2d 105, 107, 622 N.Y.S.2d 900, 902 (1995).  "Tacit in this
legislative enactment is that any injury not falling within the
new definition of serious injury is minor and a trial by jury is
not permitted under the no-fault system."  Licari, 57 N.Y.2d at
235.

In the present case, it is clear that plaintiffs did not
suffer (1) death, (2) dismemberment, (3) significant
disfigurement, (4) fracture, (5) loss of fetus or (6) permanent
loss of use of a body organ, member function, or system as a
result of the collision.

## Temporary Impairment

Plaintiffs also did not suffer an "injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such persons usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment" (hereinafter referred to as "90/180"). N.Y. Insurance Law § 5102(d). New York courts read the term "substantially all" to mean that the plaintiff has to have been "curtailed from performing [their] usual activities to a great extent rather than some slight curtailment." Gaddy v. Eyler, 79 N.Y.2d 955, 958, 591 N.E.2d 1176, 1178, 582 N.Y.S.2d 990, 992 (1992) (quoting Licari, 57 N.Y.2d at 236). Furthermore, the ninety day period of disability requirement is to be construed literally. Licari, 57 N.Y.2d at 236 (noting that "the statutory 90/180-day period of disability requirement . . . should be considered a necessary condition to the application of the statute"). In the instant case, by plaintiffs' own admissions, Mikhail was disabled and confined to his home for no more than seven days following the accident, Lubov was disabled and confined to her home for no more than two days following the accident, and Riva was disabled and confined to her home for only one day following the accident.

Pls.' Resp. to Def.'s Interogs. at ¶ 6.  Moreover, Mikhail

returned to work, at most, seven days after the accident, Lubov

returned to work, at most, two days following the accident, and

Riva, although unemployed, did not assert substantial limitations

to her usual daily activities for the required time period.

Pls.' Resp. to Def.'s Interogs. at ¶ 7.  Thus, plaintiffs cannot

plausibly claim that their daily activities were curtailed for

ninety of the first one hundred eighty days following the July

accident.  See DeFilippo v. White, 101 A.D.2d 801, 803, 475

N.Y.S.2d 141, 143 (2nd Dep't 1984) (refusing to find a serious

injury under the 90/180 category where plaintiff missed work for

approximately sixty-five days and then worked part-time for

approximately twenty-eight days).  Accordingly, plaintiffs fall

short of the threshold for serious injury under the 90/180

category.


**(4)**

**Serious Injury: "Significant Limitation" or
"Permanent Consequential Limitation"**

The only two statutory categories of "serious injury" that

might be relevant are whether plaintiffs suffered a "permanent

consequential limitation of use of a body organ or member,"

(hereinafter, "permanent consequential limitation") or a

"significant limitation of use of a body function or system"

(hereinafter, "significant limitation").  "In order to establish
a permanent consequential limitation of use of a body organ or
member, it is incumbent upon plaintiff to present competent
evidence raising triable issues as to whether her injury was both
permanent and consequential."  Kordana v. Pomellito, 121 A.D.2d
783, 784, 503 N.Y.S.2d 198, 200 (3rd Dep't 1986).  In the context
of the N.Y. Insurance Law, the term "consequential" means
"important" or "significant."  Id.  A plaintiff alleging serious
injury under the category of "significant limitation" at the
summary judgment phase must raise an issue of material fact
regarding whether her alleged limitation was "significant."  "In
this context, the term 'significant' envisions something more
than a minor limitation of use."  Id. at 785 (citing Licari, 57
N.Y.2d at 239).  "For these two statutory categories, [NY courts]
have held that '[w]hether a limitation of use or function is
"significant" or "consequential" (i.e., important . . .) relates
to medical significance and involves a comparative determination
of the degree or qualitative nature of an injury based on the
normal function, purpose and use of the body part'"  Toure, 98
N.Y.2d at 353 (quoting Dufel v. Green, 84 N.Y.2d 795, 798, 647
N.E.2d 105, 107, 622 N.Y.S.2d 900, 902 (1995)).  Generally:

> In order to prove the extent or degree of physical
> limitation, an expert's designation of a numeric
> percentage of a plaintiff's loss of range of motion can
> be used to substantiate a claim of serious injury.  An
> expert's qualitative assessment of a plaintiff's
> condition also may suffice, provided that the

> evaluation has an objective basis and compares the
> plaintiff's limitations to the normal function, purpose
> and use of the affected body organ, member, function or
> system.

Id. at 350-51 (internal citations omitted) (emphasis in

original).  Moreover, "a plaintiff's subjective claim of pain and

limitation of motion must be sustained by verified objective

medical findings."  Grossman v. Wright, 268 A.D.2d 79, 84, 707

N.Y.S.2d 233, 237 (2nd Dep't 2000).

For example, herniated discs or disc bulges do not

constitute serious injury absent objective medical evidence

demonstrating the extent or degree of the alleged physical

limitations resulting from the injuries and their duration.

Guzman v. Paul Michael Mgmt., 266 A.D.2d 508, 509, 698 N.Y.S.2d

719, 721 (2nd Dep't 1999); see also Pommells, 4 N.Y.3d at 574;

Durham v. New York East Travel, Inc., 2 A.D.3d 1113, 1114-15, 769

N.Y.S.2d 324, 325 (3rd Dep't 2003).  "[O]nce a herniated disc has

been established by objective medical evidence, such as an MRI,

CT scan or X ray, 'an expert's designation of a numeric

percentage of a plaintiff's loss of range of motion can be used

to substantiate a claim of serious injury.'"  Durham, 2 A.D.3d at

1114 (quoting Toure, 98 N.Y.2d at 350).  New York case law "has

consistently treated straight-leg raising tests as objective

evidence of serious injury."  Kim v. Cohen, 208 A.D.2d 807, 807,

618 N.Y.S.2d 386, 387 (2nd Dep't 1994).

On a motion for summary judgment for failure to meet the

"serious injury" threshold of N.Y. Insurance Law § 5102(d), New York courts place the initial burden on the defendant to establish a prima facie case that plaintiffs' injuries were not "serious."  See Gaddy, 79 N.Y.2d at 956-57.  The plaintiff must then come forward with sufficient evidence to establish that "serious injury" was indeed sustained.  Id.  In support of his motion for summary judgment against each of the three plaintiffs, defendant has submitted the affirmed reports of: (1) Dr. Soifer, an orthopedist, (2) Dr. DeJesus, a neurologist, and (3) Dr. Cohn, a radiologist.  Plaintiffs attempt to rebut this evidence by submitting reports prepared by their own expert, Dr. Rosarian.


(5)

**Mikhail's Injuries**

**A.   Defendant's Initial Burden**

Defendant submitted an orthopedic report prepared by Dr. Soifer, finding that there is no objective medical evidence that Mikhail suffered from any disability.  Def.'s Mot., Ex. E at 6. Dr. Soifer conducted a physical examination of Mikhail on October 25, 2007 which revealed "appropriate and grossly symmetric" ranges of motion, as compared with normal values, for Mikhail's cervical spine and shoulders, but found that there was a five degree less supination in Mikhail's left elbow compared to his right.  Def.'s Mot., Ex. E at 6.  Mikhail's straight-leg raise

14

was negative.  Id. at 4.  Dr. Soifer diagnosed Mikhail as "status post neck and low back strains."  Id. at 7.

Defendant also submitted a neurological report prepared by Dr. DeJesus, which similarly concluded that there was no objective medical evidence that Mikhail suffered from any disability.  Def.'s Mot., Ex. F at 5.  According to the report, Dr. DeJesus conducted a physical examination of Mikhail on October 25, 2007 which revealed normal mental status, cranial nerve response, motor abilities, reflexes, sensation, gait and coordination.  Id. at 3-5.  Dr. DeJesus also found Mikhail to have a full range of motion at his cervical and lumbar spine and his straight-leg raise was normal.  Id. at 5.  Dr. DeJesus diagnosed Mikhail as status post cervical, thoracic and lumbar sprains.  Id.

Finally, defendant submitted a radiology report prepared by Dr. Cohn, which found that Mikhail's disc bulges were degenerative and did not result from trauma.  Def.'s Mot., Ex. G at 3, 6.  Dr. Cohn reviewed the two CT scans of Mikhail's neck and back taken after the July accident.  According to Dr. Cohn's report, although the CT scan taken of Mikhail's cervical spine on August 10, 2004 revealed a disc bulge at C5-C6, the disc bulge was unrelated to trauma.  Id. at 3.  Dr. Cohn also reviewed the CT scan taken of Mikhail's lumbosacral spine on August 24, 2004, finding it to reveal disc bulges at L4-L5 and L5-S1, but

concluding that the disc bulges were degenerative and unrelated to trauma. Id. at 6. Dr. Cohn further found that there was no evidence of disc herniation. Id.

Defendant has clearly met his initial burden of bringing forth objective medical evidence that Mikhail did not suffer "serious injury." Dr. Soifer and Dr. DeJesus both observed that Mikhail exercised a full range of motion in his spine and found no evidence that Mikhail suffered from any disability. Furthermore, Dr. Cohn reviewed the two CT scans of Mikhail's cervical and lumbosacral spine taken shortly after the accident, finding that the disc bulges revealed in the scans were unrelated to trauma. The burden thus shifts to Mikhail to demonstrate that he indeed suffered a serious injury.

**B. Mikhail's Rebuttal**

Mikhail successfully rebuts defendant's evidence by introducing the affirmed report of Dr. Rosarian dated June 4, 2008, which presented objective medical evidence that Mikhail suffered a serious injury as a result of the July accident. See Pls.' Opp'n, Ex. A.

The report cites to the lower than normal results of the cervical and lumbar spine range of motion testing performed during Mikhail's initial visit with Dr. Rosarian on July 20, 2004. Id. at 1-2. Following this initial consultation, Dr. Rosarian prescribed that Mikhail perform a varied regimen of

physical therapy.  Id. at 2.  After several weeks of physical

therapy without improvement, Dr. Rosario prescribed CT testing in

order to determine the full extent of Mikhail's injuries.  Id.

Accordingly, two CT scans were taken of Mikhail's cervical and

lumbar spine on August 10, 2004 and August 24, 2004.  Dr.

Rosarian then reviewed the scans, finding them to reveal disc

bulges at C5-C6 and L4-L5, and a disc herniation at L5-S1.  Id.

However, "[a]t the conclusion of the course of therapy, it was

determined that due to the nature of the injuries sustained by

[Mikhail] as a result of the accident, no complete cure or

rehabilitation was likely and that further physical therapy would

be futile."  Id. at 3.  Dr. Rosarian noted further that following

such therapy, Mikhail continued complaining of limitations to his

daily activities including "general household duties, lifting

items in excess of 15 lbs, stair climbing, standing or sitting in

a single position for more than 15 minutes at a time, walking

distances of more than 2-3 blocks, inability to sleep comfortably

and pain in the affected areas."  Id.  Mikhail similarly

testified at his deposition that following the accident at issue,

"[g]enerally anything that has to do with [him] lifting or any

physical activity involving [his] upper body [is] more difficult

to do."  Mikhail Dep. at 47.

Dr. Rosarian also performed range of motion testing during

Mikhail's June 4, 2008 follow-up examination, which, once again,

17

revealed results lower than normal.  <u>Id.</u> at 3-4.  Specifically,

Dr. Rosarian measured the following ranges of motion:[3]

| **<u>Cervical</u>** | Normal | Tested | Decreased Range of Motion (%) |
|---|---|---|---|
| Flexion | 60 | 50 | 16.6% |
| Extension | 75 | 50 | 33.4% |
| Left Rotation | 80 | 70 | 12.5% |
| Right Rotation | 80 | 70 | 12.5% |
| Left Lateral Flexion | 45 | 40 | 11.1% |
| Right Lateral Flexion | 45 | 40 | 11.1% |

| **<u>Lumbar</u>** | Normal | Tested | Decreased Range of Motion (%) |
|---|---|---|---|
| Flexion | 60 | 50 | 16.7% |
| Extension | 25 | 20 | 20.0% |
| Left Rotation | 30 | 20 | 33.4% |
| Right Rotation | 30 | 20 | 33.4% |
| Left Lateral Flexion | 25 | 20 | 20.0% |
| Right Lateral Flexion | 25 | 20 | 20.0% |

At the June 4, 2008 examination, Dr. Rosarian also performed

a straight-leg raise, which elicited pain from Mikhail at forty

degrees bilaterally to the knees, which Dr. Rosarion stated "is

suggestive of a disc lesion, nerve root impingement or other

---

[3] Only the "Normal" and "Tested" ranges of motion were taken from Dr. Rosarian's report.

pathology in the lumbar spine . . . ." Id. at 4. He noted that
Mikhail complained of neck and lower back pain, which were
similar to the complaints made at Mikhail's initial evaluation in
2004. Id. at 3. Dr. Rosarion concluded that Mikhail suffered
from the following as a result of the July accident: "1. Cervical
myofasciitis with C5-C6 disc bulge. 2. Cervical spine
derangement. 3. Lumbar myofasciitis with L5-S1 disc herniation.
4. Lumbar spine derangement." Id. at 4. Dr. Rosarion explained
that Mikhail suffered from a partial disability related to his
loss of motion in his cervical and lumbar, and that such
disability is permanent in nature. Id.

     Mikhail's medical evidence is, at the least, sufficient to
raise a triable issue of fact as to whether his injuries meet the
statutory threshold of serious injury. Dr. Rosarion's review of
the CT scans revealing disc bulges and herniation, coupled with
objective medical tests showing a decreased range of motion in
Mikhail's cervical and lumbar spine, are enough to substantiate
Mikhail's claim that he suffered serious injury. See, e.g.,
Toure 98 N.Y.2d at 355 (finding that objective evidence showing
that plaintiff suffered two herniated cervical discs as a result
of the accident was sufficient evidence of serious injury to
survive summary judgment even though the expert did not assign a
quantitative percentage to the loss of range of motion in
plaintiff's neck or back, where he described the qualitative

nature of plaintiff's limitations based on the normal function,
purpose and use of her body parts); see also Hodder v. United
States, 328 F. Supp. 2d 335, 349 (E.D.N.Y. 2004) ("While MRI's,
x-rays and CT scans are clearly objective evidence, the courts
have also considered passive range of motion tests which are
based on objective criteria, such as straight-leg raising tests,
and observations of spasms as objective evidence because they are
not based on the patient's complaints of pain."). Specifically,
six of the twelve tests showed that Mikhail's range of motion was
limited by 20 percent or more of the normal range, which is
sufficient to demonstrate that there is an issue of material fact
as to whether his injuries meet the statutory threshold at this
summary judgment stage.[4] See Hodder, 328 F. Supp. 2d at 356
("While there is no set percentage for determining whether a

_____

[4] Defendant argues that Dr. Rosarion's report is flawed
because it does not state the type of exam that Dr. Rosarion
performed in calculating the range of motion values. Defendant
makes the same argument regarding Dr. Rosarion's reports on Lubov
and Riva. Defendant cites to no NY case law for this
proposition. Furthermore, because all three plaintiffs submitted
objective medical evidence of their injuries in the form of MRIs
and CT scans, plaintiffs are, at the very least, able to
demonstrate that an issue of fact exists on whether they suffered
a serious injury whether Dr. Rosarion performed objective or
subjective range of motion tests. See Durham v. New York East
Travel, Inc., 2 A.D.3d 1113, 1115, 769 N.Y.S.2d 324, 326 (3rd
Dep't 2003) (rejecting "defendants' contention that plaintiff's
physician was required to identify further objective medical
evidence not only of the herniated disc, but also of the 50%
reduction in range of motion . . . [where] there is independent
objective medical evidence of an injury, namely, a postaccident
MRI showing a herniated cervical disc).

limitation in range of motion is sufficient to establish 'serious
injury,' the cases have generally found that a limitation of
twenty percent or more is significant for summary judgment
purposes.") (collecting New York cases); see also Livai v.
Amoroso, 239 A.D.2d 565, 565, 658 N.Y.S.2d 973, 973 (2d Dep't
1997) (holding that a permanent 20% reduced range of motion in
cervical spine was sufficient to raise a triable issue of fact as
to whether plaintiff suffered a "significant limitation of use of
body function or system").

C.    Causation

Mikhail is also able to demonstrate a sufficient causal link
between the July accident and his injuries to raise a triable
issue.  Although defendant's experts claim that Mikhail's disc
bulges and herniation were caused by degenerative changes and not
trauma from the July accident, plaintiff sufficiently rebuts such
evidence.  Specifically, as demonstrated above, Dr. Rosarion's
report stated that Mikhail's disc bulges and herniation, revealed
in two MRIs filmed shortly after the accident at issue, were
directly caused by the trauma of the July accident.  Such
evidence, which directly conflicts with the expert reports
submitted by defendant, creates an issue of fact that cannot be
resolved on a motion for summary judgment.  See Corbett v. County
of Onondaga, 291 A.D.2d 886, 887, 738 N.Y.S.2d 621, 621 (4 Dep't
2002) ("It is well established that 'conflicting expert opinions

21

may not be resolved on a motion for summary judgment.'") (quoting
Williams v. Lucianatelli, 259 A.D.2d 1003, 1003, 688 N.Y.S. 294,
295 (4th Dep't 1999)).

Defendant, however, claims that Mikhail's involvement in two
prior accidents in 1998 and 2000[5] renders Dr. Rosarion's
conclusions speculative regarding whether Mikhail's injuries were
actually caused by the July 17, 2004 accident.

Dr. Rosarion's report presents an issue of material fact
regarding whether Mikhail's injuries were caused by the July
accident, rather than the 1998 accident.  Dr. Rosarion
specifically addressed the 1998 accident in his June 4, 2008
report.  By comparing MRI films taken in 1998, following the 1998
accident but prior to the July 14 accident, with MRI films taken
in 2004, following the July accident, Dr. Rosarion concluded
"that the C5-C6 disc bulge and the L5-S1 disc herniation are a
direct result of the accident of July 17, 2004 and are not a
result of any pre-existing condition of any kind."  Pls.' Opp'n,
Ex. A at 3.

Additionally, Dr. Rosarion's failure to address Mikhail's
second car accident in 2000 does not render his conclusions
speculative.  The New York Court of Appeals has held that "even
where there is objective medical proof, when additional

---

[5] The record is unclear whether this car accident occurred
in the year 2000, or later.  Regardless, there is no dispute that
it took place before the July 17, 2004 accident.

contributory factors interrupt the chain of causation between the accident and claimed injury–such as a gap in treatment, an intervening medical problem or a preexisting condition–summary dismissal of the complaint may be appropriate." Pommells, 4 N.Y.3d at 572. Although Dr. Rosarion does not address the 2000 accident in his report, he examined Mikhail three days after the July accident, at which time he found that Mikhail's injuries are directly related to the July accident. Pls.' Opp'n, Ex. G at 5. Furthermore, Mikhail testified that he sustained only "minor" injuries in the 2000 accident and that such injuries did not involve his neck or back.[6] Id. at 33-34. Defendant's failure to present affirmative evidence demonstrating any connection between the alleged injuries Mikhail suffered in his 2000 car accident with his present injuries, along with the substance of Mikhail's deposition testimony and Dr. Rosarion's diagnosis identifying the July accident as the direct cause of Mikhail's injuries, raises an issue of fact regarding whether Mikhail's injuries were directly caused by the accident at issue.

---

[6] However, Mikhail also testified that he used heat packs and cold packs on his neck and back following the 2000 accident. Mikhail Dep. at 35.

## Lubov's Injuries

**A.   Defendant's Initial Burden**

Defendant submitted an orthopedic report prepared by Dr. Soifer, finding that there is no objective medical evidence that Lubov suffered from any disability.  Def.'s Mot., Ex. J at 6. Dr. Soifer conducted a physical examination of Lubov on October 25, 2007 which revealed "appropriate and grossly symmetric" ranges of motion, as compared with normal values, for Lubov's cervical spine and upper extremities.  Def.'s Mot., Ex. J at 5-6. Lubov's straight-leg raise was negative.  <u>Id.</u> at 6.  Dr. Soifer diagnosed Lubov as "status post neck and low back strains."  <u>Id.</u>

Defendant also submitted a neurological report prepared by Dr. DeJesus which similarly concluded that there was no objective medical evidence that Lubov suffered from any disability.  Def.'s Mot., Ex. K at 6.  According to the report, Dr. DeJesus conducted a physical examination of Lubov on October 25, 2007, which revealed normal mental status, cranial nerve response, motor abilities, reflexes, sensation, gait and coordination.  <u>Id.</u> at 4-5.  Dr. DeJesus also found Lubov to have a full range of motion at her neck and lumbar spine and her straight-leg raise was normal.  <u>Id.</u> at 6.  Dr. DeJesus diagnosed Lubov as status post cervical and lumbar sprains.  <u>Id.</u>

Finally, defendant submitted a radiology report prepared by

Dr. Cohn, which found that Lubov's disc bulges were degenerative and did not result from any trauma.  Def.'s Mot., Ex. L at 4-6. Dr. Cohn reviewed the two MRI scans of Lubov's neck and back taken after the July accident.  According to Dr. Cohn's report, although the MRI taken of Lubov's cervical spine on August 9, 2004 revealed disc bulges at C3-C4, C4-C5 and C5-C6, there was no evidence that the bulges were related to trauma.  Id. at 4.  Dr. Cohn also reviewed the MRI taken of Lubov's lumbosacral spine on August 23, 2004, finding it to reveal a disc bulge at L4-L5, but concluding that the disc bulge was degenerative and unrelated to trauma.  Id. at 6.  Dr. Cohn further found that there was no evidence of any disc herniation.  Id.

Defendant has clearly met his initial burden of bringing forth objective medical evidence that Lubov did not suffer "serious injury."  Dr. Soifer and Dr. DeJesus both observed that Lubov exercised a full range of motion in her spine and neither expert found objective evidence of any disability.  Furthermore, Dr. Cohn reviewed the two MRI scans of Lubov's cervical and lumbosacral spine taken shortly after the accident, finding that the disc bulges revealed in the scans were unrelated to trauma. The burden thus shifts to Lubov to demonstrate that she indeed suffered a serious injury.

**B.   Lubov's Rebuttal**

Lubov successfully rebuts defendant's evidence by

introducing the affirmed report of Dr. Rosarion dated June 4,
2008, which presents objective medical evidence demonstrating
that she suffered a serious injury as a result of the July
accident.  See Pls.' Opp'n, Ex. H.

The report cites to the lower than normal results of the
cervical and lumbar spine range of motion testing performed on
Lubov's initial visit with Dr. Rosarion on July 20, 2004.  Id. at
1-2.  Following this initial consultation, Dr. Rosarion
prescribed that Lubov perform a varied regimen of physical
therapy.  Id. at 2.  After several weeks of physical therapy
without improvement, Dr. Rosario prescribed MRI testing in order
to determine the full extent of Lubov's injuries.  Id.
Accordingly, two MRIs were taken of Lubov's cervical and lumbar
spine on August 9, 2004 and August 23, 2004.  Id.  Dr. Rosarion
then reviewed the scans, finding them to reveal disc bulges at
C3-C4 and C4-C5 and a disc herniation at L4-L5.  Id.  However,
"[a]t the conclusion of the course of therapy, it was determined
that due to the nature of the injuries sustained by [Lubov] as a
result of the accident, no complete cure or rehabilitation was
likely and that further physical therapy would be futile."  Id.
at 3.  Dr. Rosarion noted further that following such therapy,
Lubov continued complaining of limitations to her daily
activities including "general household duties, lifting items in
excess of 20 lbs, stair climbing, standing or sitting in a single

position for more than 20 minutes at a time, walking distances of more than 2-3 blocks, inability to sleep comfortably and pain in the affected areas."  Id.  Lubov similarly testified at her deposition that she has pain in her neck, back and hip, and that she has a hard time bending.  Lubov Dep. at 24-25.

Dr. Rosarion also performed range of motion testing during Lubov's June 4, 2008 follow-up examination, which, once again, revealed results lower than normal.  Id. at 3-4.  Specifically, Dr. Rosarion measured the following ranges of motion:[7]

| Cervical | Normal | Tested | Decreased Range of Motion (%) |
|---|---|---|---|
| Flexion | 60 | 50 | 16.7% |
| Extension | 75 | 40 | 46.7% |
| Left Rotation | 80 | 70 | 12.5% |
| Right Rotation | 80 | 70 | 12.5% |
| Left Lateral Flexion | 45 | 30 | 33.3% |
| Right Lateral Flexion | 45 | 30 | 33.3% |

| Lumbar | Normal | Tested | Decreased Range of Motion (%) |
|---|---|---|---|
| Flexion | 60 | 50 | 16.7% |
| Extension | 25 | 20 | 20.0% |
| Left Rotation | 30 | 20 | 33.3% |

---

[7] Only the "Normal" and "Tested" ranges of motion were taken from Dr. Rosarian's report.

27

| Right Rotation | 30 | 15 | 50.0% |
|---|---|---|---|
| Left Lateral Flexion | 25 | 15 | 40.0% |
| Right Lateral Flexion | 25 | 15 | 40.0% |

At the June 4, 2008 examination, Dr. Rosarion also performed a bilateral left raising test that elicited pain from Lubov, which Dr. Rosarion stated "suggest[s] the presence of a severe sprain or disc lesion in the lumbar spine." Id. at 4. He also noted that Lubov complained of neck, lower back and left hip pain, which were similar to the complaints made at Lubov's initial evaluation in 2004. Id. at 3. Dr. Rosarion concluded that Lubov suffered from the following as a result of the July accident: "1. Cervical myofasciitis with C3-C4, C4-C5 and C5-C6 disc bulges with marked straightening of the lordosis. 2. Cervical spine derangement. 3. Lumbar spin L4-L5 disc herniation. 4. Lumbar spine derangement. 5. Left hip trochanteric bursitis. 6. Left hip derangement." Id. at 4. Dr. Rosarion explained that Lubov suffered from a partial disability related to her loss of range of motion in her cervical and lumbar, and that such disability is permanent in nature. Id.

Lubov's medical evidence is, at least, sufficient to raise a triable issue of fact as to whether her injuries are serious. The demonstration of disc bulges and herniation coupled with a measured decrease in the range of motion in her cervical and

28

lumbar spine is satisfactory to substantiate Lubov's claim of
serious injury.  See Durham, 2 A.D.3d at 1115 (finding that an MRI
scan revealing a herniated disc and loss in range of motion was
sufficient to raise triable issue regarding serious injury).
Specifically, eight of the twelve tests showed that Lubov's range
of motion was limited by 20 percent or more of the normal range,
which is sufficient to demonstrate that there is an issue of
material fact as to whether her injuries meet the statutory
threshold at this summary judgment stage.  See Hodder, 328 F.
Supp. 2d at 356.

    **C.  Causation**

    Lubov is also able to demonstrate a sufficient causal link
between the July accident and her injuries.  Although defendant's
experts claim that Lubov's disc bulges and herniation were caused
by degenerative changes and not trauma from the July accident,
plaintiff sufficiently rebuts such evidence.  Specifically, as
demonstrated above, Dr. Rosarion's report states that Lubov's
disc bulges and herniation, revealed in two MRIs filmed shortly
after the accident at issue, were directly caused by the trauma
of the July accident.  Such evidence, which directly conflicts
with the expert reports submitted by defendant, creates an issue
of fact that cannot be resolved on a motion for summary judgment.
See Corbett, 291 A.D.2d at 887.

## Riva's Injuries

### A.   Defendant's Initial Burden

Defendant submitted an orthopedic report prepared by Dr. Soifer, finding that there is no objective medical evidence that Riva suffered from any disability.  Def.'s Mot., Ex. N at 7. Dr. Soifer conducted a physical examination of Riva on October 25, 2007 which revealed an "appropriate and grossly symmetric" rotation of the cervical spine and an "appropriate and grossly symmetric" range of motion of Riva's shoulders.  Id. at 6. Riva's straight-leg raise was negative.  Id.  Dr. Soifer diagnosed Riva as "status post neck and low back strains as well as aggravation of pre-existing degenerative changes as well as right knee contusion/strain."  Id. at 7.

Defendant also submitted a neurological report prepared by Dr. DeJesus, which similarly concluded that there was no objective medical evidence that Riva suffered from any disability.  Def.'s Mot., Ex. O at 6.  According to the report, Dr. DeJesus conducted a physical examination of Riva on October 25, 2007, which revealed normal mental status, cranial nerve response, motor abilities, reflexes, sensation, gait and coordination.  Id. at 4-5.  Dr. DeJesus also found Riva to have a full range of motion at her neck and lumbar spine and her bilateral straight-leg raise was normal.  Id. at 6.  Dr. DeJesus

diagnosed Riva as status post cervical and thoracic sprain.  Id.

Finally, defendant submitted a radiology report prepared by
Dr. Cohn, which found that Riva's disc bulges were degenerative
and did not result from any trauma.  Def.'s Mot., Ex. P at 4-5.
Dr. Cohn reviewed a cervical spine x-ray[8] and MRI taken after the
July accident.  According to Dr. Cohn's report, although the x-
ray taken on July 22, 2004 revealed degenerative changes at C3-
C4, C5-C6 and C6-C7, there was no evidence that they were related
to trauma.  Id. at 4.  Specifically, Dr. Cohn found "anterior and
posterior osteophytes at C3-C4, C5-C6 and C6-C7 . . . [that]
represent bony spurs which form off the vertabral bodies," and
that there was "disc space narrowing at the C3-C4 level."  Id.
Similarly, according to the report, although the MRI taken of
Riva's cervical spine on August 9, 2004 revealed disc bulges at
C3-C4, C5-C6 and C6-C7, Dr. Cohn attributed such bulges to
degenerative disc disease, unrelated to trauma.  Id. at 5.

Defendant has clearly met his initial burden of bringing
forth objective medical evidence that Riva did not suffer
"serious injury."  Dr. Soifer and Dr. DeJesus found Riva to
exhibit a full range of motion in her spine and neither expert
found objective evidence of disability.  Furthermore, Dr. Cohn
reviewed the x-ray and MRI of Riva's cervical spine taken shortly

_____

[8] Dr. Rosarion's June 4, 2008 report makes no mention of the
x-ray taken of Riva's cervical spine.

after the accident, finding that the disc bulges revealed in the
scans were unrelated to trauma.  The burden thus shifts to Riva
to demonstrate that she indeed suffered a serious injury.

**B.  Riva's Rebuttal**

Riva successfully rebuts defendant's evidence by introducing
the affirmed report of Dr. Rosarion dated June 4, 2008, which
presents objective medical evidence demonstrating that Riva
suffered a serious injury as a result of the July accident.  <u>See</u>
Pls.' Opp'n, Ex. M.

The report cites to the lower than normal results of the
cervical spine range of motion testing performed on Riva's
initial visit with Dr. Rosarion on July 20, 2004.  <u>Id.</u> at 1-2.
Following this initial consultation, Dr. Rosarion prescribed that
Riva perform a varied regimen of physical therapy.  <u>Id.</u> at 2.
After several weeks of physical therapy without improvement, Dr.
Rosarion prescribed MRI testing in order to determine the full
extent of Riva's injuries.  <u>Id.</u>  Accordingly, an MRI was taken of
Riva's cervical spine on August 9, 2004.  <u>Id.</u>  Dr. Rosarion then
reviewed the MRI, finding it to reveal disc bulges at C3-C4, C5-
C6 and C6-C7.  <u>Id.</u>  However, "[a]t the conclusion of the course
of therapy, it was determined that due to the nature of the
injuries sustained by [Riva] as a result of the accident, no
complete cure or rehabilitation was likely and that further
physical therapy would be futile."  <u>Id.</u>  Dr. Rosarion noted

further that following such therapy, Riva continued complaining
of limitations to her daily activities including "general
household duties, lifting items in excess of 15 lbs, stair
climbing, standing or sitting in a single position for more than
10 minutes at a time, walking distances of more than 2-3 blocks,
inability to sleep comfortably and pain in the affected areas."
Id. Riva similarly testified at her deposition that she
experiences neck pain "on and off ever day practically especially
when [she] walk[s] or if [she has] to sit for a long time."  Riva
Dep. at 13.

     Dr. Rosarion also performed range of motion testing during
Riva's June 4, 2008 follow-up examination, which, once again,
revealed results lower than normal.  Id. at 3-4.  Specifically,
Dr. Rosarion measured the following ranges of motion:[9]

| Cervical | Normal | Tested | Decreased Range of Motion (%) |
|----------|--------|--------|-------------------------------|
| Flexion | 60 | 50 | 16.7% |
| Extension | 75 | 40 | 46.7% |
| Left Rotation | 80 | 60 | 25.0% |
| Right Rotation | 80 | 70 | 12.5% |
| Left Lateral Flexion | 45 | 20 | 55.6% |
| Right Lateral Flexion | 45 | 20 | 55.6% |

---

     [9]  Only the "Normal" and "Tested" ranges of motion were
taken from Dr. Rosarian's report.

Dr. Rosarion noted that Riva complained of neck and right knee pain, which were similar to the complaints made at Riva's initial evaluation in 2004. Id. at 2. Dr. Rosarion concluded that Riva suffered from the following as a result of the July accident: "1. Cervical myofasciitis with marked straightening of the lordosis as well as C3-C4, C5-C6 and C6-C7 disc bulges approximating the ventral thecal sac. 2. Cervical spine derangement. 3. Thoracic myofasciitis. 4. Thoracic spine derangement. 5. Right knee internal derangement." Id. at 3. Dr. Rosarion explained that Riva suffered from a partial disability related to her loss of range of motion in her cervical spine, and that such disability is permanent in nature. Id.

Riva's medical evidence is, at least, sufficient to raise a triable issue of fact as to whether her injuries are serious. The demonstration of disc bulges coupled with a measured decrease in the range of motion in her cervical spine is sufficient to substantiate Riva's claim of serious injury. See Durham, 2 A.D.3d at 1115. Specifically, four of the six tests showed that Riva's range of motion was limited by 20 percent or more of the normal range, which is sufficient to demonstrate that there is an issue of material fact as to whether her injuries meet the statutory threshold at this summary judgment stage. See Hodder, 328 F. Supp. 2d at 356.

### C. Causation

Riva is also able to demonstrate a sufficient causal link between the July accident and her injuries to survive summary judgment. Although defendant's experts claim that Riva's disc bulges were caused by degenerative changes and not trauma from the July accident, Riva sufficiently rebuts such evidence. Specifically, as demonstrated above, Dr. Rosarion's report states that Riva's disc bulges, revealed in an MRI of her cervical spine filmed shortly after the subject accident, were directly caused by the trauma of the July accident. Such evidence creates an issue of fact not to be resolved at this summary judgment stage. See Corbett, 291 A.D.2d at 887.


### (8)

### Gap in Treatment

Defendant's gap in treatment argument does not establish that there are no issues of fact regarding the cause of plaintiffs' injuries. Defendant argues that the gap in time between the cessation of plaintiffs' treatments and Dr. Rosarion's June 4, 2008 examinations of plaintiffs constitutes a "gap in treatment" that interrupts the chain of causation between the July accident and their claimed injuries. However, Dr. Rosarion stated, in each of the three medical reports, that plaintiffs' initial courses of treatment ended when it was

determined that each had derived the maximum medical benefit from the regimen and that their course of recovery had plateaued. Dr. Rosarion further stated that plaintiffs' June 4, 2008 examinations were "solely for the purposes of a follow-up examinations with no further treatment being rendered." Pls.' Opp'n, Ex. A at 3, Ex. H at 3, Ex. M at 2. "[W]hile a cessation of treatment is not dispositive-the law surely does not require a record of needless treatment in order to survive summary judgment-a plaintiff who terminates therapeutic measures following the accident, while claiming 'serious injury,' must offer some reasonable explanation for having done so." Pommells, 4 N.Y.3d at 574. Dr. Rosarion's explanation that plaintiffs' treatment ended because the maximum benefit had been derived is reasonable and does not weaken plaintiffs' causation argument. See Carter v. Atl. Greyhound Lines of VA, Inc., No. CV-02-0393, 2005 WL 1692639, at *8 n.9 (E.D.N.Y. 2005) (finding a doctor's instruction to cease treatment because further treatment would not relieve pain to be an adequate explanation for a cessation of treatment).

## CONCLUSION

For the above-mentioned reasons, defendant's motions for summary judgment are denied.


Dated:      Brooklyn, New York
            July 21, 2009

                              SO ORDERED:


                              _____/S/_____
                              David G. Trager
                              United States District Judge